**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| David A. Dickerson, # 369461, | ) | Case No. 2:20-cv-3467-JMC-MGB |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Warden Michael Stephan, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

David A. Dickerson, a *pro se* state prisoner, seeks habeas corpus under 28 U.S.C. § 2254. (Dkt. No. 1.)  This matter is before the Court on the Warden's Motion for Summary Judgment. (Dkt. No. 13.)  Under 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(c) (D.S.C.), the undersigned is authorized to rule on the pretrial motions and to make recommendations to the District Judge on the summary judgment motion.  For the following reasons, the undersigned recommends granting the Warden's motion and dismissing this case with prejudice.

## BACKGROUND

In June 2016, a York County Grand Jury indicted Dickerson for the following counts: criminal sexual conduct in the third degree; incest; assault with intent to commit criminal sexual conduct in the third degree; sexual exploitation of a minor in the first degree; criminal sexual conduct with a minor in the second degree, when the victim was between the ages of eleven and fourteen; and criminal sexual conduct with a minor in the second degree, when the victim was between the ages of fourteen and sixteen.  (Dkt. No. 12-1 at 5, 150–53.)  The charges stemmed from Dickerson's yearslong sexual abuse of his teenage daughter. On August 23, 2016, Dickerson pled guilty to one count of criminal sexual conduct with a minor, second degree, and one count of sexual exploitation of a minor, first degree.  (Dkt. No. 12-1 at 5–46, 150–55.)

During the guilty plea hearing, the prosecutor provided the following factual summary of

Dickerson's crimes:

> In September of 2015 law enforcement was called to a local high school where a 16-year old victim reported that her father had sexually assaulted her on their living room couch having vaginal intercourse with her before wiping off on a navy blue t-shirt.
>
> The victim disclosed that during the summer of 2012 when she was 12 years old her father came into her room and got in bed beside her and began digitally penetrating her.  She disclosed that her father would continue these assaults but escalated to putting his penis inside his child's mouth to have her perform oral sex on him.  The victim also disclosed her father performing oral sex on her and the assaults ultimately progressing to her father raping her vaginally.  The victim disclosed that over the next three years the assaults would occur frequently, sometimes several times a week.  The assaults would include oral sex but most frequently would include her father vaginally raping her.
>
> The victim disclosed within the past month her father had attempted to rape her anally but wasn't able to insert his penis into his child's anus completely.  The victim also disclosed and her father admitted calling her names such as whore and slut.  She also disclosed that he had gotten angry and punched holes in the walls of the home.
>
> The victim was taken for a rape kit.  Her underwear as well as the baby blue t-shirt that was found in the home they were both examined forensically and a mixture of the defendant's sperm with the child's DNA were found on both of those items.
>
> The defendant's phone was also forensically examined.  On that phone there was a video of the defendant being masturbated by his daughter.  There were also pictures of his daughter nude in her bedroom window—bedroom mirror, as well as photos of her masturbating.  When I spoke with the victim she disclosed that her father would make her take these photos and then send them to him.  There are also images of child pornography located not of his daughter but of other unknown girls.

(*Id.* at 12–14.) Dickerson affirmed to the judge that he had heard the facts recited by the

prosecutor, and he agreed with the facts, responding "Yes, sir[,]" when asked if that is what

happened. (*Id.* at 14.) The judge accepted Dickerson's guilty plea.  (*Id.*)  He then heard from

witnesses from both the State and the defense as to sentencing. (*Id.* at 14–44.)  Dickerson spoke

on his own behalf, beginning his statement by saying, "I stand here today guilty.  I did it.  And I

regret it more than anything in my life. I'm sorry." (*Id.* at 35.) Dickerson then discussed at length what led to his actions. (*Id.* at 35–44.) Dickerson was sentenced to twenty years' incarceration for one charge of criminal sexual conduct with a minor, second degree, and to sixteen years' incarceration for the charge of exploitation of a minor, first degree, with the sentences set to run consecutively. (*Id.* at 45.)

By and through counsel, Dickerson perfected a notice of appeal. (*See* Dkt. No. 12-3.)[1] He filed a letter on his own behalf to explain what circumstances he believed entitled him to a direct appeal of a guilty plea (Dkt. No. 12-3), but his appeal was denied because he "failed to provide a sufficient explanation as required by Rule 203(d)(1)(B)(iv) of the South Carolina Appellate Court Rules (SCACR)[,]" (Dkt. No. 12-4). The remittitur was issued by the South Carolina Court of Appeals on December 9, 2016. (Dkt. No. 12-5.) That marked the end of Dickerson's direct appeal.

On April 11, 2017, Dickerson filed an application for post-conviction relief ("PCR") in state court, alleging he received ineffective assistance of counsel and that his guilty plea was made unintelligently and involuntarily. (Dkt. No. 12-1 at 54–60.) The PCR court held a hearing on the application in January 2018. (*Id.* at 68–136.) Dickerson, his mother, and plea counsel testified. (*Id.*) In an order dated April 5, 2018, and filed May 17, 2018, the PCR court rejected Dickerson's claims and denied Dickerson's application. (*Id.* at 137–49.)

Dickerson appealed. (Dkt. No. 12-6.) Dickerson was appointed an appellate defender, who filed a *Johnson*[2] petition for writ of certiorari on Dickerson's behalf. (Dkt. No. 12-7.) The single issue raised in the *Johnson* petition was as follows:

---

[1] In the Notice of Appeal, counsel represented that the plea hearing did not result in any issue preserved for appellate review. (Dkt. No. 12 at 3.)
[2] PCR appellate counsel filed the petition pursuant to *Johnson v. State*, 364 S.E.2d 201 (1988), indicating that, in her opinion, the appeal was without legal merit, and further moving to be

Whether Petitioner's guilty plea was knowingly, intelligently, and voluntarily made when plea counsel improperly pressured Petitioner to plead guilty by repeatedly advising him pleading guilty was his "only option" and that if he did not plead guilty he "would leave prison in a box," and where Petitioner was prejudiced because he would not have pled guilty but for counsel's undue pressure, particularly where Petitioner was severely depressed due to the allegations and not thinking clearly?

(*Id.* at 3.)  The state supreme court transferred the case to the court of appeals. (*See* Dkt. No. 12-8.)  That court denied certiorari and granted PCR appellate counsel's request to withdraw on June 30, 2020.  (*Id.*)  It issued the remittitur July 30, 2020, and the circuit court filed the remittitur on August 3, 2020.  (Dkt. No. 12-9.)

## **PROCEDURAL HISTORY**

Dickerson filed his habeas petition in September 2020.  In his petition, he asserts the following three grounds for relief:

Ground One:  Mr. Dickerson was denied his right to effective assistance of counsel due to the fact that trial counsel repeatedly and continually used fear and intimidation to coerce Mr. Dickerson into accepting a plea offer and to not go to trial.

Ground Two:  Mr. Dickerson was denied his right to effective assistance of counsel due to the fact that trial counsel at no time allowed Mr. Dickerson to review any of the discovery materials.  Nor did counsel provide Mr. Dickerson with a copy of the material when he requested it multiple times.

Ground Three: Mr. Dickerson was denied his right to effective assistance of counsel due to trial counsel's refusal to listen to, consider, investigate, or have law enforcement investigate any facts that might have been used to form a trial defense for Mr. Dickerson.

(Dkt. No. 1-1 at 1, 4, 6.)

Along with his petition, Dickerson filed a motion for an extension of time seeking an extension of the one-year limitations period to file his petition and a motion to appoint counsel, both of which were denied without prejudice.  (Dkt. Nos. 2, 3, 6, & 7.)

relieved as counsel.  (Dkt. No. 12-7 at 13.)

After the petition was served on the Warden, he filed a return and motion for summary judgment. (Dkt. Nos. 12 & 13.) The Court issued a *Roseboro* order on January 25, 2021, advising Dickerson he had thirty-one days from the order date to respond to the Warden's motion. (Dkt. No. 14.) Dickerson filed a motion for an extension of time, which the Court granted, giving him until March 25, 2021, to file a response. (Dkt. Nos. 16 & 18.) The Court later extended Dickerson's deadline to April 30, 2021, when he had not responded to the motion for summary judgment but had filed both a motion to appoint counsel and for discovery. (Dkt. Nos. 24, 26, & 28.) Dickerson wrote a letter on April 22, 2021, asking for another extension of time because he had just received a number of documents that had been mailed by the Court and the Warden in late March and early April. (Dkt. No. 35.) The Court extended Dickerson's response deadline to May 24, 2021. (Dkt. No. 36.) Following another request by Dickerson, the Court extended Dickerson's deadline a final time—to June 14, 2021. (Dkt. Nos. 40 & 41.) Dickerson filed a response in opposition to the motion for summary judgment on May 27, 2021. (Dkt. No. 43.) On June 9, 2021, Dickerson filed an affidavit and additional supporting documentation for his response in opposition to the motion for summary judgment.[3] (Dkt. No. 49.) On June 10, 2021, the Warden filed a reply to the response to the motion for summary judgment. (Dkt. No. 48.)

---

[3] On June 15, 2021, the Court received a letter from Dickerson's mother, Bonnie B. Nalan. (Dkt. No. 50.) In the letter, Nalan describes difficulties Dickerson has encountered while pursuing his habeas action while incarcerated during the Covid-19 pandemic. On June 16, 2021, the Court received a letter from Dickerson further outlining the difficulties he has encountered while pursuing this action. (Dkt. No. 51.) In particular, Dickerson's letter highlights the problems with delays in prison mail and the inability to get copies of documents from plea counsel and law enforcement agencies. (*See id.*) As outlined above, the Court has given Dickerson ample time to respond to the motion for summary judgment, and Dickerson has thoroughly argued his grounds to the Court. Further, the Court has denied discovery in this case. (Dkt. No. 38.) The undersigned finds that no other accommodations are necessary at this time to address the issues raised in the petition.

Since his initial motion to appoint counsel, Dickerson has filed three more motions seeking the appointment of counsel. (Dkt. Nos. 17, 21, & 24.) Dickerson also filed a motion for discovery. (Dkt. No. 26.) These motions have all been denied. (Dkt. Nos. 19, 21, & 38.)

The only remaining motion for the Court's review is the Warden's motion for summary judgment. As set forth above, this motion is ripe for habeas review.

## **LEGAL STANDARD**

Habeas corpus in federal court exists to "guard against extreme malfunctions in the state criminal justice systems." *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (citation and internal quotation marks omitted). Federal habeas is neither an alternative to state-court relief nor an additional chance to appeal erroneous state-court rulings. *See id.* That preference for, and deference to, state courts is borne out in the various constraints placed on federal courts. *See Shoop v. Hill*, 139 S. Ct. 504, 506 (2019) (per curiam) (stating § 2254 "imposes important limitations on the power of federal courts to overturn the judgments of state courts in criminal cases"); *see also Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (stating § 2254 "reflect[s] a presumption that state courts know and follow the law" (citation and internal quotation marks omitted)).

For instance, state prisoners who challenge matters "adjudicated on the merits in State court" cannot get relief in federal court unless they show that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law" announced by the Supreme Court or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d). That means a state court's ruling must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Federal courts must also defer to state courts' factual determinations, which are

presumed correct until the prisoner rebuts that presumption with clear and convincing evidence. § 2254(e)(1).

In addition, before state prisoners may try to clear those high hurdles, two rules steer them to first pursue all relief available in the state courts. *See* § 2254(b)(1). The first, known as exhaustion of remedies, requires a prisoner to present his claims to the highest state court with jurisdiction to decide them. *Stewart v. Warden of Lieber Corr. Inst.*, 701 F. Supp. 2d 785, 790 (D.S.C. 2010). A federal court cannot grant a prisoner's habeas corpus petition until he exhausts his state-court remedies. § 2254(b)(1), (c). The second rule, called procedural default, comes into play when a prisoner failed to present a claim to the state courts at the appropriate time and has no means of doing so now. *Stewart*, 701 F. Supp. 2d at 790. Federal courts may not consider a procedurally defaulted claim unless the prisoner shows either that he has cause for defaulting and that the alleged violation of federal law prejudiced him or that not addressing the claim would be a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

The ultimate issue in this case is, of course, whether Dickerson should receive habeas relief under these standards. However, the Warden's summary judgment motion and briefing presents narrower questions. Summary judgment is appropriate only if the moving party shows that "there is no genuine dispute as to any material fact" and that he is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also* Rule 12, Rules Governing § 2254 Cases (stating courts may apply in habeas cases any of the Federal Rules of Civil Procedure to the extent they are not inconsistent with statutes or the § 2254 rules). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P.

56(c)(1). Rule 56 mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Viewing the habeas rules through the lens of Rule 56, the Court has three questions to answer at this juncture:

(1)     Are there genuine issues of fact as to whether Dickerson's claims are properly before the Court?

(2)     Are there genuine issues of fact as to the merits of Dickerson's claims?

(3)     If the answer to either (or both) of the first two questions is "no," is the Warden entitled to judgment as a matter of law?

In answering those questions, the undersigned has carefully considered the record before the Court and has liberally construed the materials Dickerson has submitted. *See, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

## DISCUSSION

The Warden contends that Dickerson's habeas petition is timely and that he exhausted his state-court remedies. (Dkt. No. 12 at 9–11.) Thus, the petition is properly before the Court; however, the Warden asserts that Grounds Two and Three are procedurally barred. (*Id.* at 11–14.) The Warden further asserts that all of the grounds presented in the petition lack merit. (*See id.* 16–28.)

As explained below, the undersigned finds that Grounds One and Two are properly before the Court and not procedurally defaulted. Ground Three is procedurally defaulted, in part. However, because Dickerson has failed to demonstrate that he is entitled to relief on any of these grounds, the undersigned recommends granting the Warden's motion for summary judgment.

## I.     Ineffective-Assistance-of-Counsel Standard

All of Dickerson's claims allege ineffective assistance of counsel. The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). A petitioner proves ineffective assistance by showing his attorney's performance was deficient and prejudiced him. *Id.* at 687. An attorney's performance is deficient if it was unreasonable under the circumstances of the case and under then-prevailing professional norms. *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). Prejudice is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" means "a probability sufficient to undermine confidence in the outcome." *Kimmelman*, 477 U.S. at 384.

The two-part test enunciated in *Strickland* applies to challenges to guilty pleas based on ineffective assistance of counsel. *See Hill v. Lockhart*, 474 U.S. 52, 58 (1985). "[I]n order to satisfy the 'prejudice' requirement [set forth in *Strickland*], the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 59.

*Strickland* is highly deferential to counsel, and § 2254(d) is highly deferential to state courts. *Harrington*, 562 U.S. at 105. That means when a state court has adjudicated an ineffective-assistance claim on the merits, this Court's review is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). In other words, the question becomes "not whether counsel's actions were reasonable," but "whether there is any reasonable argument that [Dickerson's] counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.[4]

---

[4] Subsection 2254(d)'s standards are to be applied to the decision from the highest state court to decide the claim at issue on the merits. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). Where, as here, the highest state court rules summarily, the federal habeas court should "look through" that unexplained decision to the last state-court decision that provides a relevant

## II.    Ground One

In Ground One, Dickerson asserts that plea counsel used fear and intimidation to coerce him into pleading guilty.  (Dkt. No. 1-1 at 1.)  According to Dickerson, when he and plea counsel discussed his case, plea counsel raised his voice and cursed.  (*Id.* at 2.)  Dickerson alleges that plea counsel told him it did not matter if the victim was telling the truth or not because if she was called as a witness, everyone would believe her.  (*Id.*)  Plea counsel also reportedly told Dickerson, "'the only way you don't leave prison in a box is if you plead guilty and try to mitigate the amount of time the judge gives you,' and 'if you try to fight any of this you a fxxxing stupid and you will never walk out of prison.'" (*Id.*)  Dickerson further alleges that plea counsel told him how to answer the judge's questions the morning of the guilty plea and told him that if he answered the wrong way, the judge might not accept the plea offer, and Dickerson would go to trial.  (*Id.*)

During his guilty plea colloquy, Dickerson told the judge that no one had forced, pressured, or coerced him into pleading guilty.  (Dkt. No. 12-1 at 9.)  He also told the judge that he was satisfied with the services of his attorney.  (*Id.* at 10.)  During the sentencing portion of the proceeding, Dickerson spoke at length on his own behalf, admitting guilt and expressing great remorse for his crimes.  (*Id.* at 35–44.)

At the PCR evidentiary hearing, Dickerson testified that his initial plan was to kill himself, either before any court date or after pleading guilty, but his mother convinced him to fight the charges.  (*Id.* at 81.)  When Dickerson met with plea counsel and brought up a discrepancy in the victim's statement, plea counsel called Dickerson stupid and told him that if

---

rationale, and "should then presume that the unexplained decision adopted the same reasoning." *Id.*  In this case, the PCR court was the only one to issue a reasoned decision on Dickerson's claim.  As neither party contends the court of appeals denied certiorari on different reasoning than what the PCR court provided, the undersigned has used the PCR court's reasoning to

he tried to fight the charges, he would be found guilty on all six charges. (*Id.* at 82.) Dickerson further testified that, at some point, plea counsel communicated a forty-year plea offer from the state, and when Dickerson "asked him what [his] options would be and [plea counsel] basically said that the plea option was the only option [Dickerson] had, that [if Dickerson] didn't take this plea, that [he] would . . . leave prison, in [plea counsel's] words, in a box." (*Id.* at 84.) Dickerson testified "I didn't say anything after that. I mean, you know that's—reaffirmed what I was planning to do anyways." (*Id.*) Dickerson essentially testified that he felt intimidated by plea counsel and ultimately "just gave up" and entered the guilty plea. (*Id.* at 102.) On cross-examination, Dickerson indicated that he lied during the guilty plea colloquy and did not pay attention and fully admitted guilt because "it was the only hope I had not to die in prison." (*Id.* at 106–07.)

Plea counsel also testified at the PCR evidentiary hearing and was emphatic that Dickerson never told counsel that he wanted to go to trial. (*Id.* at 126.) Plea counsel also explained that the prosecutor would not recommend anything less than forty years in Dickerson's case. (*Id.* at 120–21.) Plea counsel testified, "literally I can't do any more begging than I did on this case." (*Id.* at 120.) He tried everything he could to get a lower recommendation, but it was to no avail. If the case had gone to trial, plea counsel believed there would have been a lot of uncharged conduct introduced, and there were also additional exploitation charges that had not been indicted, and to plea counsel that "was a huge concern . . . ." (*Id.* at 122.) Plea counsel admitted to making some of the statements Dickerson had attributed to him, explaining

> [W]hen I say you're going to get life or you're not getting out of prison in a box (sic), which I don't denying saying that—I mean this is a very serious case, and this is a very serious amount of time we're dealing with . . . he was facing a ton of time that must be run consecutive . . . .

---

analyze the merits of Dickerson's claim.

(*Id.*)

The PCR court considered this allegation—that Dickerson's guilty plea was coerced—both as a stand-alone involuntary-guilty-plea claim and as an ineffective-assistance-of-counsel claim. (*Id.* at 146–48.) After citing the applicable standard as to what renders a guilty plea involuntary, the PCR court found as follows:

> This Court finds, and the record reflects, Applicant was fully advised that he was pleading guilty and therefore waiving any challenges to the evidence against him. The plea court's thorough colloquy with Applicant demonstrates that he understood the consequences of pleading guilty and the potential sentences he could receive. Applicant advised the plea court that no one had promised him anything in order to get him to plead guilty. Applicant also advised the plea court that he was pleading guilty freely and voluntarily. The record also reflects that Applicant fully admitted his guilt to the plea court and agreed with the State's version of the facts. Applicant presented no credible evidence at the PCR hearing as to why he should be able to depart from his statements at the plea hearing. The Court finds credible Counsel's testimony regarding his preparation and advice to Applicant prior to the guilty plea. After a full review of the guilty plea transcript, the Court finds the plea judge correctly found Applicant's plea was freely, voluntary, and intelligently made. This Court also finds that Applicant had presented no evidence that he did not understand the plea proceeding or that his plea was not freely, voluntarily, or intelligently made.
>
> Furthermore, this Court finds Applicant's allegation that Counsel pressured him into pleading guilty is without merit. Applicant alleged Counsel pressured him into pleading guilty by telling him he would "leave prison in a box" and get the maximum sentence if he went to trial. The Court finds Applicant's responses at the plea hearing indicate he was not coerced or pressured into pleading guilty and Applicant was well aware of the potential lengthy sentences he faced when pleading guilty. This Court finds Applicant has failed to meet his burden of proving Counsel improperly coerced him into pleading guilty or that Counsel's actions made Applicant's plea involuntary. Furthermore, Applicant has failed to show that but for Counsel's actions, he would not have pled guilty but would have proceeded to trial. Applicant openly admitted guilt several times during the plea hearing and during the PCR hearing and did not prove that he would rather have a trial. Accordingly, this allegation must be dismissed.

(*Id.* at 147–48.)

The PCR court's rejection of Dickerson's claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was the PCR court's decision based on an

unreasonable determination of the facts. As noted above, the PCR court found plea counsel's testimony credible regarding his preparation and advice to Dickerson. Such a factual finding on credibility is "presumed to be correct[,]" and Dickerson has the "burden of rebutting the presumption . . . by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Wilson v. Ozmint*, 352 F.3d 847, 860 (4th Cir. 2003) ("These facts do not compel the credibility determination reached by the state court, but they certainly provide sufficient basis, for purposes of section 2254(d)(2), to support such a determination."). He has not met his burden. Largely, Dickerson reasserts the same arguments he made to the PCR court. These arguments were rejected by the PCR court despite some indication that the court hade deemed some of Dickerson's allegations credible. Indeed, some of PCR counsel's testimony was consistent with Dickerson's, particularly as to counsel's advice regarding the plea offer. Nevertheless, the PCR court found that plea counsel's statements did not rise to the level of coercion or render Dickerson's guilty plea involuntary. Furthermore, the PCR court found that Dickerson failed to prove that, absent any alleged deficiency by counsel, he would have proceeded to trial. Dickerson has failed to show that the PCR court's conclusion was based on either an unreasonable application of federal law or unreasonable factual findings.

## III.     Grounds Two and Three

In Ground Two, Dickerson argues that plea counsel was ineffective for not allowing him to review the discovery in his case or to keep a copy of the discovery materials. (Dkt. No. 1-1 at 4–5.) In Ground Three, he asserts that plea counsel was ineffective for failing to investigate any facts that could have been used in his defense. (*Id.* at 6–10.) He lists eight aspects of his case that he now asserts plea counsel should have investigated further. (*Id.*) The Warden asserts these grounds are procedurally barred or, in the alternative, lack merit.

### A.     Procedural Default

The Warden asserts that these grounds are procedurally defaulted because they were raised to and ruled upon by the PCR court but were not subsequently raised in Dickerson's PCR appellate brief. However, in accordance with state law, claims raised to and ruled upon by the PCR court are preserved for appellate review, and when a *Johnson* petition is filed, those claims are subsequently reviewed by the appellate court as outlined in *Anders v. California*, 386 U.S. 738 (1967). *See Johnson*, 364 S.E.2d at 201 (affirming that the *Anders* procedure is required in post-conviction appeals where counsel deems the issues meritless and requests to withdraw); *see also Jamison v. State*, 765 S.E.2d 123, 128 (S.C. 2014) ("A petition filed pursuant to *Johnson v. State* is the post-conviction relief equivalent of a direct appeal filed pursuant to *Anders v. California*. This Court recently held that, '[u]nder the *Anders* procedure, an appellate court is required to review the entire record, including the complete trial transcript, for any *preserved* issues with potential merit.'" (quoting *McHam v. State*, 746 S.E.2d 41, 46 (2013)) (internal citations and footnotes omitted)). Thus, to the extent the issues in Grounds Two and Three were raised to and ruled upon by the PCR court, they would have also been reviewed in the *Johnson* PCR appeal and are preserved for habeas review, as well. Accordingly, the undersigned cannot accept the Warden's argument that Grounds Two and Three are procedurally defaulted in their entirety.[5]

Based on the undersigned's review of the record, Ground Two is not procedurally barred. Ground Three, on the other hand, includes a number of issues that were not presented to and ruled upon by the PCR court. As such, it is necessary to parse through which claims under Ground Three are preserved and which are not. In the petition, Dickerson identifies the following areas that he believes plea counsel should have investigated further:

---

[5] In denying Plaintiff's prior Motion for Discovery, the undersigned indicated Ground Three was procedurally barred. (Dkt. No. 38 at 5.) Regardless of this finding, discovery was still properly denied because, as discussed further below,

(1)    <u>Dickerson's alibi for a particular assault</u> – The family court documents indicate that an assault took place at 12:30 a.m. on a particular day, but Dickerson alleged he was at work from 7 p.m. to 7 a.m. that day, which could have been corroborated if plea counsel had investigated: (a) payroll time card punches, (b) video from Dickerson's workplace, (c) co-worker statements, or (d) the vehicle bar code security system at Dickerson's workplace;

(2)    <u>Victim had previously made similar allegations</u> – According to the petition, these previous allegations were investigated by the Department of Social Services but found to be false;

(3)    <u>Internet searches by the victim</u> – Dickerson asserts that he found searches on the victim's phone regarding "how to set up a man for rape" and "how to trap a man for rape[;]"

(4)    <u>Statement inconsistencies</u> – There were inconsistencies in statements concerning the times the assaults took place and how many years the abuse had been going on;

(5)    <u>That the victim's mother was never criminally charged</u> – Dickerson asserts that the victim's mother (his wife) admitted to knowing about the abuse for years because the victim had previously reported the abuse to her;

(6)    <u>How the police obtained Dickerson's phone</u> – Dickerson alleges impropriety in the way the police obtained his phone. According to Dickerson, he had left his phone with his mother, and his wife (victim's mother) took the phone from his mother's house without permission and turned it into the police. Dickerson further alleges that his wife later told him she had helped the police because they threatened her with jail time and the loss of parental rights. The warrant for Dickerson's phone did not include a search of his mother's house; and

(7)    <u>Lack of certain forensic evidence</u> – Although there was a mixture of Dickerson's and the victim's DNA on the victim's underwear and on a shirt of Dickerson's that he had reportedly used to clean himself after the assault, Dickerson asserts "there was no mention of DNA evidence in or on the alleged victim's vagina. Nor was ther [sic] any mention of pubic hair evidence. Both of which would be expected if a sexual assault had occurred . . . ." (Dkt. No. 1-1 at 9.)

(Dkt. No. 1-1 at 6–9.)

Having reviewed the record, the undersigned finds there was no reference to the specific allegations raised in claims (2), (3), (4), (5), or (7) during the PCR action. As such, Dickerson's

argument that plea counsel was ineffective for failing to further investigate those areas is procedurally defaulted and, thus, barred in this action. However, the general allegation that plea counsel was ineffective for failing to do further investigation was considered by the PCR court, and Dickerson gave some testimony about the facts outlined in claims (1) and (6). Out of an abundance of caution, the undersigned will review the merits of those claims in greater detail below.

In response to the motion for summary judgment, Dickerson alleges that any procedural default should be excused due to ineffective assistance of PCR appellate counsel. Specifically, he asserts that PCR appellate counsel erred in failing to raise the issues alleged in Grounds Two and Three to the appellate court, and he was prejudiced. However, as already explained above, by filing a *Johnson* petition, PCR appellate counsel effectively raised any preserved issues in Dickerson's PCR appeal. It is the claims that were not adequately raised to and subsequently ruled upon by the PCR court that are barred here. Moreover, while there is case law that allows habeas petitioners to avoid procedural default where, due to PCR counsel's error, a potentially meritorious ineffective-assistance claim became procedurally defaulted at the first level of PCR review, *see Martinez v. Ryan*, 566 U.S. 1, 14 (2012), that law does not apply here. "Ineffective assistance of PCR appellate counsel, as opposed to initial PCR counsel, is not cause for a default" under *Martinez*. *Cobbs v. Cartledge*, No. 9:15-cv-3038-MBS-BM, 2016 WL 9019648, at *6 (D.S.C. June 16, 2016) (citing *Martinez*, 566 U.S. at 11, and collecting cases), *report and recommendation adopted,* 2016 WL 9019649 (D.S.C. Oct. 11, 2016). Consequently, any alleged errors that Dickerson attributes to PCR appellate counsel cannot excuse the default.

Dickerson has failed to articulate any additional excuse for the procedural default of claims (2), (3), (4), (5), and (7) under Ground Three, and none is readily apparent.[6]  As such, the procedural bar of these issues should stand.

### B.    Merits Review

Dickerson asserts that he repeatedly asked plea counsel to show him the discovery materials and provide him with a copy of the same.  (Dkt. No. 1-1 at 4.)  He claims that plea counsel refused—either telling Dickerson that he had not received the materials yet or he had not received all of the materials yet.  (*Id.*)  After plea counsel's representation had ended, Dickerson again requested his discovery materials, but plea counsel did not provide them.  (*Id.* at 5.)  He also asserts that he attempted to bring several factual issues (listed above) to plea counsel's

---

[6] In general, Dickerson appears to allege he is innocent of the crimes to which he pled guilty.  To the extent his claim of innocence could arguably excuse any procedural default, Dickerson must show he is *actually innocent* of the charges for which he has been convicted.  *Finch v. McCoy*, 914 F.3d 292, 294 (4th Cir. 2019); *see also McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) (stating the exception "is grounded in the equitable discretion of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons" (internal quotation marks omitted)).  "A valid actual innocence claim 'requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *Finch*, 914 F.3d at 298 (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)).  A petitioner asserting actual innocence "must also demonstrate that the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt, such that his incarceration is a miscarriage of justice." *Id.* (citation omitted); *see also Finch*, 914 F.3d at 298 (stating a federal court reviewing the totality of the evidence "'is not bound by the rules of admissibility that would govern at trial' and must consider 'all evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after trial'" (quoting *Schlup*, 513 U.S. at 327–28)).  If the petitioner meets that standard, the court may consider the merits of the claim.  *See id.*  Meeting that standard, however, is exceedingly difficult.  *See House v. Bell*, 547 U.S. 518, 538 (2006) ("[T]he *Schlup* standard is demanding and permits review only in the extraordinary case." (citation and internal quotation marks omitted)).

Dickerson has not presented any new, reliable evidence to demonstrate his actual innocence.  His stand-alone, unsupported claims of innocence are insufficient to meet the exacting standard set by the Supreme Court.

attention.  (*Id.* at 6.)  But plea counsel refused to investigate those issues that could have been used in Dickerson's defense.[7]  (*Id.*)

Dickerson did not raise these issues during his guilty plea colloquy.  To the contrary, he told the plea judge that he was satisfied with plea counsel's services.  (Dkt. No. 12-1 at 10.)

During the PCR evidentiary hearing, Dickerson testified that he never saw any of the discovery materials for his case.  (*Id.* at 74.)  The only paperwork that Dickerson recalled seeing was a family court document related to his crimes.  (*Id.* at 75.)  According to Dickerson, he and plea counsel spoke over the phone a few times, and counsel initially told Dickerson he did not have any discovery, and then he told Dickerson that he had some, but not all of the discovery, and they should wait to meet until plea counsel had everything.  (*Id.* at 76.)  Then plea counsel eventually called to discuss the plea offer that the Attorney General's office had extended.  (*Id.*)  Dickerson testified that he met with plea counsel multiple times, but they did not go over any materials during those meetings.  (*Id.* at 77–78.)  Dickerson testified that his mother was at some of the meetings, and she asked plea counsel if he had seen any of the pictures or videos that the prosecution had "and he told her that that would've been illegal, that he was not allowed to look at those files.  And then at a later visit he said he had seen them."  (*Id.* at 79.)  According to

---

[7] In denying Petitioner's Motion for Discovery, the undersigned indicated this portion of Petitioner's Ground Three was procedurally barred. (Dkt. No. 38 at 5.) Regardless of this finding, discovery was still properly denied. Specifically, as discussed further below, there is no reason to believe that Petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief. *See Wolfe v. Johnson*, 565 F.3d 140, 165 n.3 (4th Cir. 2009) (finding "good cause" to authorize discovery exists when "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief" (quoting *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997)). Further, Petitioner's Motion for Discovery sought evidence to establish a Fourth Amendment violation and, as the undersigned noted, federal habeas review of Petitioner's Fourth Amendment claim is barred in this action. (Dkt. No. 38 at 4–5); *See Grimsley v. Dodson*, 696 F.2d 303 (4th Cir.1982) ("*Stone v. Powell*. . . marked, for most practical purposes, the end of federal court reconsideration of Fourth Amendment claims by way of habeas corpus petitions where the petitioner had an opportunity to litigate those claims in the state court.").

Dickerson's testimony, he told plea counsel he was guilty, and he did not ask plea counsel to do any further investigation because he "didn't care" and "was fully planning on killing [himself] before any Court date." (*Id.* at 76, 81.) Dickerson testified that he raised the issue that he was working at the time of the assault alleged in the family court documents, and plea counsel responded that that was likely a mistake. (*Id.* at 78.) Nevertheless, plea counsel cautioned that if Dickerson wanted to go forward with trial, he would be found guilty based on the evidence the prosecution had. (*Id.* at 78, 81–82.) Dickerson testified that his mother also asked plea counsel about whether the police had properly obtained his phone.[8] (*Id.* at 92.) According to Dickerson, there was never a search warrant issued for his phone, but his wife took it from his mother's house without permission. (*Id.*) As far as Dickerson knew, there was no investigation in his case. (*Id.* at 82.)

After his guilty plea, Dickerson asked plea counsel by letter for a copy of his discovery materials. (*Id.* at 102–03.) Dickerson testified as to how plea counsel responded,

> After I filed the second letter, Mr. Sheldon called my mother and told him he (sic) didn't appreciate the threatening letter that I had sent him the second letter requesting my stuff, and then he told her—I—we were on lockdown at prison, so I had no communication out. We were on a—we—changed wardens and we were on lockdown for a month or so, and that was when all this was occurring. He called her and used those same fear and intimidation and told her that if I had these documents in my cell, that other inmates would get them and they would know what I was convicted for and that I would be in danger in prison, that my life would be in danger.
>
> Q     Okay. And what happened—but—so as far as—
>
> A     And she went and got the documents.

(*Id.* at 103.)

---

[8] In clarifying that it was his mother, and not himself, who had asked plea counsel about the phone issue, Dickerson testified, "I will say I told Mr. Sheldon I was guilty, and it wasn't out of guilt or innocence. It was because I didn't want to fight, okay." (Dkt. No. 12-1 at 92.)

Plea counsel testified that the discovery in Dickerson's case consisted of: (1) the search warrant for Dickerson's cell phone, which plea counsel provided him; (2) the statement from the victim, which was also shared with Dickerson; (3) the videos from Dickerson's phone, which plea counsel described to Dickerson; and (4) the photos from Dickerson's phone. (*Id.* at 117–20.) Plea counsel testified that he went over the facts with Dickerson although Dickerson's "defense from day one was, I'm in love with my daughter, I don't consider this rape, I considered her to be my wife, my wife had abandoned me, basically my home life is terrible, and I fell in love with my daughter." (*Id.* at 123.) Plea counsel also testified that much of the discovery "just wasn't relevant at all." (*Id.*) He noted that Dickerson did not plead to "the 12:30 incident" referenced in family court documents—those charges were dropped as part of the plea deal. (*Id.* at 122.) Plea counsel also confirmed that Dickerson's wife had given his phone to police, but plea counsel had provided Dickerson with a copy of the search warrant for the police to access the phone. (*Id.* at 117.) As to other evidence, plea counsel testified that he had reviewed the forensic evidence, but to his recollection, Dickerson's case was not largely built on forensics. (*Id.* at 127.) As far as plea counsel's contact with Dickerson's mother, plea counsel confirmed much of Dickerson's testimony, explaining

> He specifically asked for his discovery, some of which is on—was on a disk, but nothing—none of the pornographic stuff, so you can't—you're not going to get that in prison anyways, so I said, look, I called [Dickerson's mother] and I said . . . . you can have the discovery, he can have it, but is—this is going to be extremely easier for you to come get it from my office, file, you can have anything in it, I just need it back because . . . this appeal's going nowhere, he's going to file a PCR, which he did, and I'm going to need to get that file to his PCR attorney as well. So she came to my office and got it . . . . [N]o question that . . . the contents of that file you do not want to end up at Lee Correctional. I do a ton of PCRs; I deal with this a lot, and it's not like I was saying, you can't—you can't have your file. I was saying [Dickerson's mother] needs to get the file and figure out how to present this to Mr. Dickerson in such a manner where people at Lee Correctional aren't looking at it and saying you had sex with your thirteen year old daughter every day for, you know, three years. I don't—I agree that that would not have been the best approach for him.

(*Id.* at 128–29.)

The PCR court rejected Dickerson's claim that PCR counsel was ineffective for failing to provide or explain the discovery or investigate the case. (*Id.* at 144–45.) The PCR court found credible plea counsel's testimony that he reviewed the video and photo evidence and discussed with Dickerson both the contents of the videos and photos and the import of that evidence on Dickerson's case. (*Id.*) The PCR court concluded that Dickerson failed to show deficiency or what additional investigation would have revealed, and the PCR court declined to speculate as to that issue. (*Id.* at 145.) The PCR court also rejected Dickerson's claim that plea counsel failed to explain or share discovery, finding that plea counsel "thoroughly explain[ed] the photographs, videos, and victim's statement." (*Id.*) Finally, the PCR court found that Dickerson failed to show prejudice, as well, because "he . . . failed to meet his burden of showing the [sic] he would not have pled guilty but would have proceeded to trial had Counsel undertaken different investigation and gone over the discovery differently." (*Id.*)

The PCR court's conclusion is largely based on the court's credibility findings, which are entitled to deference here. *See Cagle v. Branker*, 520 F.3d 320, 324 (4th Cir. 2008) ("[F]or a federal habeas court to overturn a state court's credibility judgments, the state court's error must be stark and clear."); *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."). Dickerson has not offered clear and convincing evidence to rebut the PCR court's credibility findings. Nor has Dickerson articulated how the PCR court's conclusion is the result of unreasonable factual findings or an unreasonable application of federal law. Indeed, as with Ground One, plea counsel's testimony was consistent with Dickerson's in some respects. For example, both agree that Dickerson told

plea counsel he was guilty. Dickerson's testimony at the PCR evidentiary hearing that he did not ask plea counsel to do any investigation contradicts the list of areas that he now claims to have asked plea counsel to investigate.

Moreover, based on his conversations with Dickerson, plea counsel testified, "[T]his was in a plea posture from the very beginning." (Dkt. No. 12-1 at 132.) The record demonstrates that plea counsel's actions and the PCR court's findings align with *Strickland*, which states, "Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." *Strickland*, 466 U.S. at 691. Even if Dickerson had successfully demonstrated error on plea counsel's part, Dickerson repeatedly testified that he had expressed a desire to plead guilty. Thus, he did not prove that he would have proceeded to trial had plea counsel provided him with discovery or further investigated his case. The record shows that the PCR court applied *Strickland* and found Dickerson had not met his burden as to either deficiency or prejudice, and Dickerson has not demonstrated that the PCR court's conclusion was unreasonable.

For all of the above reasons, Dickerson has failed to show that he is entitled to habeas relief here.

### Certificate of Appealability

If the Warden's summary judgment motion is granted, the District Judge will need to decide whether to issue a certificate of appealability. *See* Rule 11(a), Rules Governing § 2254 Cases. A certificate may be issued only upon a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a petitioner's constitutional claims have been denied on the merits, the petitioner must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller–El v.*

*Cockrell*, 537 U.S. 322, 338 (2003) (citation and quotation marks omitted). The undersigned sees no reason to grant a certificate of appealability and would, therefore, recommend denying the certificate of appealability.

## CONCLUSION

For the above reasons, the undersigned recommends the Court grant the Warden's motion, dismiss this case with prejudice, and decline to issue a certificate of appealability.

**IT IS SO RECOMMENDED.**

June 17, 2021
Charleston, South Carolina

_____

MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

The parties' attention is directed to the **important notice** on the next page.

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).